**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FELIX ESTUARDO MAQUIZ MACDONALD, *Petitioner-Appellant*, v. ANTHONY HEDGPETH, Warden, *Respondent-Appellee.* | No. 16-55240 D.C. No. 5:11-cv-00970-JAK-PJW OPINION |

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted March 8, 2018
Pasadena, California

Filed November 5, 2018

Before: Diarmuid F. O'Scannlain\* and Jacqueline H.
Nguyen, Circuit Judges, and Michael H. Simon,\*\*
District Judge.

---

\* Judge O'Scannlain was drawn by lot to replace Judge Reinhardt. Ninth Circuit General Order 3.2.h. Judge O'Scannlain has read the briefs, reviewed the record, and listened to the tape of oral argument held on March 8, 2018.

\*\* The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

Opinion by Judge Simon;
Dissent by Judge O'Scannlain

## SUMMARY***

### Habeas Corpus

The panel reversed the district court's denial of a habeas corpus petition brought by California state prisoner Felix Estuardo Maquiz MacDonald (Maquiz), and remanded regarding imposition of a gang enhancement pursuant to California Penal Code § 186.22(b)(1) to Maquiz's sentence for a robbery conviction.

The panel held that the state trial court's admission of opinion testimony from a law enforcement expert on street gangs, who described for the jury the potential benefits that a street gang might receive when a member commits a robbery by himself, did not deny Maquiz a fundamentally fair trial and due process, and was not contrary to, or an unreasonable application of, Supreme Court precedent.

The panel held that such expert testimony was, however, insufficient to support Maquiz's ten-year gang enhancement to his sentence for a robbery that he committed alone. The panel held that the state court's decision was an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979), and no rational trier of fact could have found this

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

expert testimony by itself sufficient to prove the elements of the robbery gang enhancement beyond a reasonable doubt.

Dissenting, Judge O'Scannlain wrote that despite the Supreme Court's repeated admonitions to this Circuit that the Antiterrorism and Effective Death Penalty Act means what it says, the majority treats this appeal just like another State court direct review of a criminal conviction and erroneously orders grant of the writ based on California law, rather than Federal law.

## COUNSEL

Michael T. Drake (argued), Research and Writing Attorney; Hilary L. Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Daniel Rogers (argued), Supervising Deputy Attorney General; Kevin Vienna, Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

**OPINION**

SIMON, District Judge:

## I.  INTRODUCTION

Felix Estuardo Maquiz MacDonald ("Maquiz")[1] appeals the district court's denial of his petition for writ of habeas corpus. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). We review de novo a district court's denial of a writ of habeas corpus. *Poyson v. Ryan*, 879 F.3d 875, 887 (9th Cir. 2018).

In this appeal, we address two questions. First, we consider whether the state trial court's admission in evidence of opinion testimony from a law enforcement expert on street gangs, who described for the jury the potential benefits that a street gang might receive when a member commits a robbery by himself, denied Maquiz a fundamentally fair trial and due process under the U.S. Constitution. We conclude that it did not. Second, we consider whether such expert testimony by itself was sufficient to support Maquiz's ten-year gang enhancement to his sentence for a robbery that he committed alone in 2001. We conclude that it was not. We hold that the state court's decision was an unreasonable application of *Jackson v. Virginia*, and no rational trier of fact could have found this expert testimony by itself sufficient to prove the elements of the 2001 robbery gang enhancement beyond a reasonable doubt. 443 U.S. 307, 319 (1979) (Stevens, J., concurring). Because there was no other evidence presented at trial to support the gang sentencing enhancement for the 2001 robbery, we reverse the district

---

[1] All parties below refer to Petitioner-Appellant as "Maquiz," rather than "MacDonald." We continue that practice.

court's denial of the petition for habeas relief and remand for resentencing by the state trial court.

## II.  BACKGROUND

### A.  Facts

Early one morning in June 2001, an adult male was using a pay phone outside a restaurant in Perris, California. Two friends of that person were sitting on a bench nearby, waiting for the call to end. Maquiz approached the person on the pay phone from behind. Maquiz held a silver handgun in one hand and kept his other hand over his face. He also wore a knitted cap pulled down to his eyes, further concealing his identity. When the friends realized what was happening, they ran to a gas station and called the police. Maquiz told the person at the pay phone to give Maquiz money or he would shoot. Maquiz searched through the robbery victim's pockets and took the victim's wallet. Maquiz then told the victim to run or else Maquiz would kill him. The victim ran to the same gas station and found his friends.

Within minutes, police arrested Maquiz in the vicinity, based on the description given by the victim and his friends. When Maquiz first saw the police, he threw something in the bushes. The police later found a loaded silver .22-caliber handgun. Maquiz had on his person eight .22-caliber bullets, which matched the bullets from the gun found in the bushes. Maquiz also had $70. He did not have the victim's wallet. The victim and his friends identified Maquiz.

### B.  Trial

In January 2002, Maquiz went to trial before a California state court jury. The prosecution charged Maquiz with three counts of second degree robbery. One count related to the

June 2001 robbery that Maquiz committed alone, and two counts related to a robbery that Maquiz committed in May 1999 with other gang members. The prosecution also charged Maquiz with one count of unlawfully carrying a concealed weapon and one count of showing false identification to a police officer. In addition, the prosecution sought gang sentencing enhancements for each of the three robbery counts, a personal firearm use sentencing enhancement for the 2001 robbery, and a gang/vicarious firearm use sentencing enhancement for each of the two 1999 robbery counts. The court asked the jury to determine whether certain allegations relating to the sentencing enhancements were true.

Only the gang sentencing enhancement for the 2001 robbery is at issue in this appeal. California Penal Code ("CPC") § 186.22(b)(1) provides for additional punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." For violent felonies, such as robbery, the statute prescribes an additional term of ten years imprisonment as a gang penalty enhancement. CPC § 186.22(b)(1)(C).

The jury convicted Maquiz on all five counts: three counts of second degree robbery, one count of carrying a concealed weapon, and one count of showing false identification to a police officer. The jury also found true the allegations that Maquiz committed counts 1 through 4[2] for

---

[2] Count 1 was based on the 2001 robbery that Maquiz committed alone. Counts 2 and 3 were based on the 1999 robbery that Maquiz committed with other gang members. Count 4 was based on the

the benefit of a street gang (the gang enhancement), that Maquiz personally used a firearm in count 1 (the personal firearm use enhancement), and that a principal other than Maquiz used a firearm in counts 2 and 3 (the gang/vicarious firearm use enhancement).

## C. After Trial

Maquiz appealed. After several state court appeals, the trial court resentenced Maquiz for the second time in November 2005. For count 1, Maquiz received a total sentence of twenty-three years imprisonment, consisting of three years for second degree robbery, plus a consecutive term of ten years for personally using a firearm in the commission of a felony, plus a consecutive term of ten years for the gang enhancement. For counts 2 and 3 (related to the 1999 robbery that Maquiz committed with other gang members), the trial court included a gang enhancement of three years each for counts 2 and 3 and ordered that Maquiz serve portions of his sentence for those crimes concurrently with his sentence imposed in count 1. For the charge of unlawfully carrying a concealed firearm (count 4), the court sentenced Maquiz to two years for the underlying offense plus a consecutive term of three years as a gang enhancement. The court stayed all three three-year gang sentencing enhancements imposed in counts 2, 3, and 4.

Maquiz did not directly appeal his final sentence. He did, however, file *pro se* a habeas petition in state court, alleging five grounds for relief, including the two certified in this appeal. The California Court of Appeal denied Maquiz's habeas petition without comment. The California Supreme

---

allegation that Maquiz carried a concealed weapon during the 2001 robbery.

Court granted review and issued an order directing the Court of Appeal to vacate its earlier order on other grounds. The California Supreme Court did not, however, address the Court of Appeal's denial of Maquiz's claims about improper admission of gang expert testimony or insufficient evidence to support the gang penalty enhancement. In June 2011, Maquiz filed his federal habeas petition.

The district court denied that petition, and this appeal followed. We issued a certificate of appealability on two issues. First, we asked whether the state trial court violated Maquiz's rights to a fair trial and due process under the U.S. Constitution by permitting a law enforcement expert on street gangs to testify that in his opinion Maquiz committed the 2001 robbery for the benefit of a gang. Second, we asked whether there was sufficient evidence in the trial record to support the gang sentencing enhancement for the 2001 robbery.

## III. HABEAS STANDARDS

A petitioner may obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When a petitioner presents claims to a state court and relief is denied, "it may be presumed that the state court adjudicated the claim[s] on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's

burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. at 98.

## IV. ADMISSIBILITY OF EVIDENCE

At trial, a deputy sheriff testified as an expert witness on street gangs. The deputy told the jury that he was familiar with the Perres Mara Villa ("PMV") gang and that Maquiz was an active member of that gang. Maquiz argues that the deputy's testimony was equivalent to an opinion that the gang enhancement allegations were true.

Federal habeas courts generally do not review questions of state evidentiary law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Evidence erroneously admitted warrants habeas relief when it results in the denial of due process under the U.S. Constitution. *Id*. at 68. "Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009) (quoting *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990)).

In *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), we addressed a nearly identical challenge. We noted that "[f]ederal habeas courts do not review questions of state evidentiary law" and concluded that because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue . . . the admission of the opinion testimony of [the gang expert] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent." *Id*. at 1077–78 (internal citation omitted).

The deputy's testimony did not violate Maquiz's right to due process. The state trial court's admission in evidence of

the deputy's testimony also was not contrary to, or an unreasonable application of, Supreme Court precedent. The district court therefore did not err in denying this aspect of Maquiz's habeas petition.

## V.  SUFFICIENCY OF EVIDENCE

### A.  *Jackson* and AEDPA

Maquiz "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). First, he must meet the burden under *Jackson v. Virginia* of showing that "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (Stevens, J., concurring) (emphasis in original). Second, after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), the standards of *Jackson* are applied "with an additional layer of deference," requiring the federal court to determine "whether the decision of the [state court] reflected an 'unreasonable application of' *Jackson* . . . to the facts of this case." *Juan H.*, 408 F.3d. at 1274–75; *see also Bruce v. Terhune*, 376 F.3d 950, 960 (9th Cir. 2004) (O'Scannlain, J., concurring). In considering a challenge to the sufficiency of the evidence, however, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence." *Juan H.*, 408 F.3d. at 1279; *see also Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (noting that "mere suspicion or speculation cannot be the basis for the creation of logical inferences" (internal quotation marks omitted)).

No California court supplied any explanation for rejecting Maquiz's claim of insufficiency of the evidence. Maquiz, however, did not raise this issue in his first direct appeal, in which the California Court of Appeal addressed all of his claims in a written decision. Instead, Maquiz first presented this issue in his state habeas petition, which the California Court of Appeal summarily rejected. Thus, we must determine whether there is *any* reasonable basis in the record on which the California Court of Appeal could have denied Maquiz's claim of insufficient evidence for the gang enhancement for the 2001 robbery. *Harrington*, 562 U.S. at 98.

"Insufficient evidence claims are reviewed by looking at the elements of the offense under state law." *Emery v. Clark*, 643 F.3d 1210, 1214 (9th Cir. 2011); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Jackson*, 443 U.S. at 324 n.16 (stating that "the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law").

B.  The California Gang Sentencing Enhancement

The gang sentencing enhancement under CPC § 186.22(b)(1) may be applied only if the prosecution proves beyond a reasonable doubt that (1) the defendant committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) the defendant did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members." The first prong is called the "gang related" requirement. The second is called the "specific intent" requirement.

When defining the contours of the first prong, the California Supreme Court has cautioned that "[n]ot every crime committed by gang members is related to a gang." *People v. Albillar*, 244 P.3d 1062, 1071 (Cal. 2010). The gang enhancement applies only to crimes that are "gang related." *Id.* "Mere active and knowing participation in a criminal street gang is not a crime." *People v. Rodriguez*, 290 P.3d 1143, 1147 (Cal. 2012) (discussing CPC § 186.22(a)); *see also People v. Perez*, 18 Cal. App. 5th 598, 607 (Cal. Ct. App. 2017) ("Nor can a crime be found to be gang related simply because the perpetrator is a gang member with a criminal history."). "The gang enhancement cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes." *People v. Ochoa*, 179 Cal. App. 4th 650, 663 (Cal. Ct. App. 2009); *see also Perez*, 18 Cal. App. 5th at 607 (noting that "[a]lthough a lone actor is subject to a gang enhancement, merely belonging to a gang at the time of the commission of the charged conduct" cannot support the gang enhancement). To hold otherwise would mean that the "gang enhancement would be used merely to punish gang membership." *People v. Rios*, 222 Cal. App. 4th 542, 574 (Cal. Ct. App. 2013).

California courts find the elements of the gang enhancement satisfied when, for example, defendants commit crimes with gang members, wear gang colors during a crime, victimize rival gang members or others potentially threatening gang turf, bring objects with potential gang symbols to the crime, and have tattoos potentially symbolizing the gang. *See, e.g.*, *Albillar*, 244 P.3d at 1071–74; *People v. Livingston*, 274 P.3d 1132, 1170–72 (Cal. 2012); *People v. Ewing*, 244 Cal. App. 4th 359, 379–81 (Cal. Ct. App. 2016).

C. Deputy Brewer's Testimony

Maquiz argues that there was insufficient evidence presented at trial for any rational juror to find either the "gang related" requirement or the "specific intent" requirement for the 2001 robbery. Maquiz also contends that for the California Court of Appeal to have concluded otherwise was an unreasonable application of *Jackson*. Defendant-Appellee concedes that Maquiz did not commit the 2001 robbery at the direction of or even in association with the PMV gang or any of its members. Defendant-Appellee argues, however, that there was still sufficient evidence in the form of Deputy Brewer's expert testimony to establish that Maquiz committed the 2001 robbery for the benefit of the PMV gang.

The only evidence relevant to the gang enhancement came from Deputy Sheriff Brewer, who testified both as a fact witness and as an expert. Deputy Brewer described the common name for the PMV gang and the symbols and signs used by that gang. He also testified about his personal interactions with Maquiz and other PMV gang members. Deputy Brewer showed the jury photographs depicting Maquiz with other known PMV gang members at a funeral. The deputy also presented to the jury field-interview cards, involving other law enforcement interactions with Maquiz. The deputy, testifying as an expert witness, told the jury that, in his opinion, Maquiz was an active member of the PMV gang. The deputy added that PMV's primary activities included homicide, robbery, carjacking, and intimidation of witnesses and victims.

The prosecutor asked the deputy whether he was familiar with CPC § 186.22. Deputy Brewer told the jury that he was. The prosecutor asked the deputy to describe some of the elements required under this statute for the gang sentencing

enhancement to apply. The deputy explained that the statute required evidence of a "pattern of criminal activity." The deputy told the jury facts about specific crimes committed by PMV gang members other than Maquiz.

The prosecutor also asked the deputy for his opinion about how a crime committed by a gang member acting alone might still benefit the gang. The deputy testified:

> A.      A person acting alone, the benefit of that or where that can benefit the gang, the individual is a gang member. He wants to further his respect with other gang members. And when we talk about respect among gang members, basically that's like a fear and intimidation factor. The more feared you are, the more intimidating you are, the more respect you obtain. It's not the respect that we would normally see in layman terms.
>
> Q.      Let me stop you. What about within the community itself, outside of the gang?
>
> A.      Right. You want to—you want—that fear and intimidation is not only within the gang or—you know, the respect that you gain in the gang, but the fear and intimidation goes out into the community. I mentioned it on the graffiti. You want the people to know you're the ones that run that area and you don't want to mess with Perres Mara Villa, you know, because we're the ones that are in charge of this area. This is our turf.

> And beyond just the fear and intimidation that it's creating, the fruits of the crime. Whatever money might be obtained or property or anything, that—that's not necessarily only maintained by that individual. He's going to share those things with other members of the gang. Maybe the individual owns a vehicle and uses that money to pay for gas or maintenance on his vehicle, and then his vehicle is used by the gang in the commission of other crimes or in their daily travels and stuff. It's a bigger picture. It's not just that one moment that individual's involved in that.

In addition, the prosecutor asked the deputy for his opinion on whether Maquiz's actions in the June 2001 robbery "constitute[d] some sort of benefit for the Perres Mara Villa gang?" The deputy responded, "Yes, they did." The deputy explained that the gang benefitted from the 2001 robbery because the robbery "furthered knowledge of, fear and intimidation factor for the gang and for the individual as a member of that gang. But also the benefit of anything that was obtained through the crime, the gang could benefit from that." The deputy also opined that Maquiz would "probably have a tendency to talk about" the robbery and that "if [other gang members] were present" while Maquiz still had robbery proceeds, he would then either share the money taken or what he purchased with that money. The deputy added, "[m]aybe he buys something the gang can use in the future or maintain something they already have with that money."

D.  Analysis of the Gang Related Prong

Deputy Brewer's testimony alone is not sufficient to sustain the gang related prong.  Although *Jackson* holds that a court must presume that the trier of fact resolved all reasonable inferences in favor of the prosecution "even if it does not affirmatively appear in the record," *Jackson*, 443 U.S. at 326, the inferences must nevertheless be supported by record evidence and must be reasonable.

Here, the jury heard that other gang members committed a robbery in PMV territory at one of at least two (if not more) AM/PM locations in Perris.  Without any additional evidence, we cannot presume that Marquiz robbed the same location three months later.  We also cannot assume that the jury knew or inferred where PMV's territory was located, especially in light of Deputy Brewer's acknowledgement that the gang's territory shifted due to a turf war with another gang.

The prosecution also did not present any evidence that Maquiz displayed any gang signs, symbols, or colors during the 2001 robbery, made any threats or comments about gangs during the 2001 robbery, or that the victim of or witnesses to the 2001 robbery were even aware that Maquiz was a gang member. The prosecution also offered no evidence that Maquiz met with any gang members either shortly before or shortly after the 2001 robbery, that Maquiz discussed the 2001 robbery with any gang members, or that Maquiz shared any proceeds from the 2001 robbery with any gang members.

As for how the 2001 robbery may have benefitted the gang, Deputy Brewer said only: (1) inside the gang, the robbery would engender fear of and respect for Maquiz; (2) outside the gang, the robbery would engender fear of and

respect for the gang generally; and (3) because Maquiz would "probably have a tendency to talk about" the robbery within the gang about the robbery, he also likely would share the proceeds from the robbery with the gang, or at least spend a portion of the proceeds on something shared with the gang. In these ways, according to the deputy, the gang would benefit from the robbery that Maquiz committed alone in 2001.

The evidence presented at trial showed only that Maquiz committed the 2001 robbery alone, without wearing or displaying gang symbols, signs, or colors. There also was no evidence that the victim even knew that Maquiz was a gang member. Maquiz's decisions to hold his hand over his face and to wear a knitted cap pulled down to his eyes indicate a desire to conceal his face and remain anonymous. An anonymous perpetrator's crime has no effect on a gang's reputation, and the perpetrator's gang affiliation, if any, remains a mystery. Thus, no evidence would permit a reasonable inference that Maquiz performed the robbery to secure any particular territory for the gang or to enhance the gang's reputation.

There also was no evidence that Maquiz discussed the robbery with any gang member, that he shared the proceeds of the crime with any gang member, or that he had even committed solo crimes before and then shared the proceeds of those earlier crimes with gang members. The deputy's opinions and conclusions were "purely conclusory and factually unsupported." *Perez*, 18 Cal. App. 5th at 608. There was no fact-specific analysis.

Testimony of this kind from a gang expert, even when coupled with personal knowledge that a defendant is a gang member, is insufficient under CPC § 186.22(b)(1) to prove that a particular crime committed alone was "gang related."

To hold otherwise would turn the statute into a penalty enhancement simply for committing a crime while being a gang member. That, however, is an impermissible construction of the statute. *See, e.g., Albillar*, 244 P.3d at 1071; *Rodriguez*, 290 P.3d at 1147; *Perez*, 18 Cal. App. 5th at 607; *see also Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005) (affirming district court's grant of sentencing relief in habeas case when evidence of specific intent to benefit gang was insufficient to support gang sentencing enhancement under either *Jackson* or with additional deference afforded state courts under AEDPA). Federal courts do not allow such suspicion and speculation to support a jury verdict, even under the dual layers of judicial deference accorded to *Jackson* claims in federal habeas proceedings. *See Juan H.*, 408 F.3d. at 1279; *Walters*, 45 F.3d at 1358; *see also Briceno*, 555 F.3d at 1078–83 (finding that without flashing gang signs or some other indication of gang membership or a connection between the robbery and the gang, there was insufficient evidence to support the gang enhancement).[3]

E.  Analysis of the Specific Intent Prong

For the same reasons, the evidence is also insufficient to support the second prong of the gang enhancement, requiring specific intent. The trial record lacks *any* evidence showing that Maquiz had the specific intent to commit the 2001 robbery "to promote, further, or assist in any criminal conduct by gang members." CPC § 186.22(b)(1). Maquiz actively sought to hide his identity during the crime and the

---

[3] Some of *Briceno*'s discussion relating to the specific intent prong does not survive *Albillar*, because the crime in *Briceno* was committed by more than one gang member and *Albillar* holds that specific intent can be inferred if the crime is committed with fellow gang members. That aspect of *Albillar*, however, does not apply in this case because Maquiz acted alone.

record is devoid of any evidence at the 2001 crime tying it to the gang. As discussed above, no rational juror could have found that the 2001 crime took place in PMV territory.

The dissent relies on PMV graffiti in the area to suggest that Maquiz intended for the robbery to be connected to the gang. Even under the deferential review standard of *Jackson*, that inference is unreasonable and suggests that Maquiz's gang membership alone would be sufficient to show specific intent, despite Maquiz's effort to hide his identity (and hence his gang affiliation) during the crime.

F.  Conclusory Expert Testimony Alone Is Insufficient

Consistent with our analysis that the evidence here was insufficient to support the gang enhancement under clearly established federal law under *Jackson*[4], in *People v. Perez*, the California Court of Appeal found similar expert testimony insufficient to support the gang enhancement when there was no evidence the attempted murders took place in gang territory, resulted from gang retaliation, or benefitted the gang's reputation. 18 Cal. App. 5th at 601–10 (Cal. Ct. App. 2017). The *Perez* court noted that typical evidence connecting the crimes to gangs was absent, namely "gang colors, gang clothing, gang accruements, gang signs,

---

[4] Despite the dissent's contention that we rely on analogous state court decisions and Ninth Circuit precedent, we provide these cases simply to demonstrate that they are in agreement with our federal analysis. We do not rely on any California decisions when evaluating the sufficiency of the evidence. Instead, we rely on California decisions solely to define the elements of the gang enhancement, as *Jackson* requires. 443 U.S. 324 n. 16 ("[T]he standard must be applied with *explicit* reference to the substantive elements of the criminal offense *as defined by state law*.") (emphasis added). We agree with the dissent that the sufficiency of the evidence is purely a question of federal law.

gang epithets, [and] help by other gang members." *Id.* at 613–14; *accord People v. Franklin*, 248 Cal. App. 4th 938, 943–44 (Cal. Ct. App. 2016) (finding expert testimony insufficient when crimes occurred in and out of gang territory and no gang members were aware of the assault); *People v. Lancaster*, 2011 WL 1680392, at *4–*5 (Cal. Ct. App. May 5, 2011) (unpublished) ("We join the growing chorus of appellate decisions that have critically reviewed the perfunctory testimony of gang experts and found it insufficient to support the gang enhancement. . . . It is not our task to fill in the gaping evidentiary holes that the prosecution has sidestepped by means of boilerplate 'gang expert' testimony."). As we previously found, "the testimony of a gang expert, without more, is 'insufficient to find an offense gang related.'" *Johnson v. Montgomery*, 899 F.3d 1052, 1058 (9th Cir. 2018) (*quoting People v. Ochoa*, 179 Cal. App. 4th at 657).

## VI. CONCLUSION

We conclude, after a deferential review, that no rational juror could have found from the evidence presented at trial that all allegations required for the gang sentencing enhancement were true for Maquiz's 2001 robbery. Thus, there was no basis and therefore also no reasonable basis on which the California courts could have rejected Maquiz's argument that the gang sentencing enhancement for count 1 was unsupported by sufficient evidence. His petition for habeas relief should have been granted on this issue, and the California state trial court should resentence Maquiz consistent with this decision. For these reasons, we reverse and remand to the district court to grant the claim in the habeas petition regarding the imposition of the gang sentencing enhancement for count 1.

**REVERSED AND REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting:

The Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, empowers our court to order grant of a writ of habeas corpus in this case only if the California courts reached "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. § 2254(d) (emphasis added).  Yet despite the Supreme Court's repeated admonitions to this Circuit that AEDPA means what it says, *see, e.g.*, *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (per curiam), the majority treats this appeal just like another State court direct review of a criminal conviction and erroneously, in my view, orders grant of the writ based on California law, rather than Federal law.

Respectfully, I must dissent.

I

Let me begin by restating the relevant facts.  Felix Maquiz[1] was convicted of three counts of robbery in a California Superior Court in 2002: two counts from a 1999 robbery and one count from a 2001 robbery.

In May of 1999, Maquiz robbed an "AM/PM" mini-market in Perris, California.  Two employees working in the store at the time, Betty Walton and José Lopez, reported that Maquiz pointed a shotgun at Lopez, demanded the cash from the register, and fled the store.  Walton followed Maquiz outside and saw him get into the passenger side of a maroon

---

[1] As does the majority, I refer to the Appellant as "Maquiz," rather than his legal last name, "MacDonald," because all parties refer to him as Maquiz.

vehicle, which then drove away. Two days later, police officers saw a maroon vehicle chasing a car down the street in Perris, and the officers pulled the maroon vehicle over. Inside was Maquiz and his friend, Ricardo Hoyos, along with a shotgun fitting the description of the one used in the mini-market robbery. Officers arrested Maquiz and Hoyos for robbing the mini-market and attempting to intimidate a witness in the car they were chasing.

In June of 2001, Maquiz robbed Kenneth Cheney at a pay phone outside of Jenny's Restaurant in Perris. With his hand held over his face, Maquiz approached Cheney from the rear with a gun and demanded that Cheney hand over his wallet. After receiving the wallet, Maquiz told Cheney to run home or he would kill him. Cheney ran to a nearby gas station, where two witnesses who had called the police were waiting. The witnesses described Maquiz as wearing a puffy black jacket, a dark beanie pulled down to his eyebrows, and dark slacks. A short while later, police officers discovered Maquiz a few blocks away from the restaurant and placed him under arrest for the robbery.

Maquiz was charged with three counts of robbery—two counts from 1999 (Lopez and Walton) and one count from 2001 (Cheney)—along with several other crimes. The prosecution also sought sentence enhancements for each robbery under California Penal Code § 186.22(b)(1), which provides for a ten-year enhancement when "any person . . . is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Thus, whether Maquiz intended to benefit the criminal activities of a gang was a critical issue at trial.

The State's primary source of evidence to support the gang enhancements was testimony from Deputy Eric Brewer, a member of the Perris Police Department's gang unit. Deputy Brewer, having received hundreds of hours of training on gang activity over his career, testified as an expert witness on gang activity. He testified that both Maquiz and Hoyos were members of the Perres Mara Villa (PMV), the "largest" and "primary Hispanic gang in the city of Perris," which focused primarily on robberies, homicides, witness intimidation, carjacking, and other crimes. Hoyos and Maquiz were "active" members of PMV, meaning that they "actually ha[d] a potential to be out on the street and they actively r[an] with the gang." And Maquiz was known as "Mr. Lucky" in the gang, which is "a significant thing, in that most [gang members] don't obtain [a nickname] unless they're living the lifestyle."

Deputy Brewer also discussed how a robbery—even one committed alone—might benefit PMV: "[T]he fear and intimidation goes out into the community. . . . You want the people to know you're the ones that run that area and you don't want to mess with Perres Mara Villa." Likewise, Brewer testified that the fruits of the robbery could be helpful to the gang, explaining that "[w]hatever money might be obtained . . . [is] not necessarily only maintained by that individual. He's going to share [it] with other members of the gang." More generally, Brewer testified that "whether it be just . . . one [crime] or . . . two, three crimes in just a short period of time as a group, they continue to work as an organization."

Deputy Brewer then specifically discussed the 1999 and 2001 robberies.

When asked whether the 1999 robbery "constituted a benefit for the Perres Mara Villa gang," Brewer answered

affirmatively, stressing the "fear and intimidation factor" and stating that "any money that was taken in the crime can be used by those gang members to further their activities."

Brewer also testified that the 2001 robbery "constitute[d] [a] benefit for the Perres Mara Villa gang." Brewer explained that the robbery "furthered knowledge of [the gang]," and he highlighted once again the "fear and intimidation factor for the gang and for [Maquiz] as a member of that gang." Brewer then described how Maquiz might have shared the proceeds of the 2001 robbery with his gang: "Out of a respect factor, he would probably have a tendency to talk about it. And as far as sharing that, if [PMV] were present while he still had that money . . . he would either share it or [PMV would] benefit . . . by what he spends the money on."

The jury found Maquiz guilty of each robbery count, and found the allegations to support the gang sentence enhancements true beyond a reasonable doubt. After several rounds of direct appeals, Maquiz was sentenced to twenty-three years in prison, with the terms of each gang enhancement to run concurrently. Maquiz then filed a habeas petition in the state court system, arguing, among other things, that (1) the superior court committed constitutional error by permitting Deputy Brewer to testify to the ultimate truth or falsity of his gang enhancements and (2) insufficient evidence supported the 2001 gang enhancement. The California Court of Appeal for the Fourth District denied the habeas petition without comment, and the Supreme Court of California—while granting the habeas petition on some grounds—did not address either of the above grounds for relief.

Maquiz then filed a federal habeas petition reasserting his arguments, and the district court denied relief. Maquiz timely appealed.

## II

The majority rightly rejects Maquiz's first argument—that habeas relief is warranted because Deputy Brewer testified directly to the truth or falsity of his gang enhancements—because Maquiz can point to no law clearly established by the Supreme Court of the United States that would prohibit such testimony. Maj. Op. at 9.

But the majority runs astray in its analysis of Maquiz's second argument. The majority holds that the evidence at his trial was constitutionally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), to support the 2001 gang enhancement, and that therefore there was "no reasonable basis on which the California courts could have rejected Maquiz's [habeas petition]." Maj. Op. at 20.

With respect, I believe the majority's analysis is incorrect.

## A

*Jackson* instructs that when assessing the sufficiency of the evidence challenge to a criminal conviction, we must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. And, as all must agree, "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). That is, "on habeas review, a federal court may not overturn

a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable."  *Id.* (internal quotation marks omitted).  So when we combine *Jackson* and AEDPA deference, our inquiry is whether *no* "fairminded jurist[]" could conclude that "*any* rational trier of fact could have" found sufficient evidence to support the conviction.  *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Jackson*, 443 U.S. at 319.  "If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

B

I suggest that the majority's analysis is premised upon two core misunderstandings of how a federal court is to assess a *Jackson* claim under AEDPA.

1

First, the majority looks to the wrong law:  rather than rely exclusively on the law clearly established by the Supreme Court as AEDPA commands, the majority turns to what it views as analogous state court decisions.  More specifically, the majority disregards Deputy Brewer's expert testimony in support of the gang enhancement because some decisions from the California Courts of Appeal have held insufficient the testimony of gang experts to support enhancements in other cases.  Maj. Op. at 17, 19–20.  But, obviously, state courts do not clearly establish federal law on the Supreme Court's behalf.  *See Cuero*, 138 S. Ct. at 9 (admonishing the Ninth Circuit for substituting "state-court decisions" in lieu of decisions from the Supreme Court when operating under the AEDPA standard of review).

In holding otherwise, the majority takes refuge in the Supreme Court's instruction that the *Jackson* standard must be applied by "reference to the substantive elements of the criminal offense as defined by state law." 443 U.S. at 324 n.16. But it does not at all follow from such premise that the *sufficiency of the evidence* required to meet those elements may be ascertained by reference to state law. Rather, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is *purely a matter of federal law*." *Coleman*, 566 U.S. at 655 (emphasis added). Indeed, the Supreme Court reversed the Third Circuit for making precisely the same mistake as the majority makes here. In *Coleman*, the Court held that "it was error for [that Circuit] to look to Pennsylvania law in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id.* We should heed the same guidance in this case. To do otherwise contravenes *Jackson*, which "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial." *Id.*

The majority offers a final reason to justify its reliance on state court cases, noting briefly that federal court decisions similarly "do not allow . . . suspicion and speculation to support a jury verdict." Maj. Op. at 18. Setting aside the heavily generalized nature of such an assertion, the majority sees fit to bolster it with cases from only *our court*. But as the Supreme Court has repeatedly admonished, Ninth Circuit precedent "does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)); *see also Cuero*, 138 S. Ct. at 9; *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam).

2

Second, the majority fails to answer the only question AEDPA asks of us: whether fairminded jurists could disagree regarding the *Jackson* question presented in this case. That is, our inquiry here surely is not whether the California courts correctly applied the *Jackson* standard, but whether the State's courts applied it in an objectively unreasonable fashion. We must take significant care not to mistake the two inquiries. *See Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

But once the majority holds the evidence insufficient under *Jackson* to support Maquiz's gang enhancement, it immediately concludes, as if it *necessarily followed*, that there was "no reasonable basis on which the California courts could have rejected Maquiz's argument that the gang sentencing enhancement . . . was unsupported by sufficient evidence." Maj. Op. at 20. Such perfunctory reasoning collapses the "two layers of judicial deference" that we must afford when evaluating a *Jackson* claim under AEDPA. *Coleman*, 566 U.S. at 651. So while the majority begins its analysis with a boilerplate recitation of the AEDPA standard of review, Maj. Op. at 10, AEDPA deference enjoys "no operation or function in its reasoning," *Harrington*, 562 U.S. at 104.

C

Any serious engagement with the question AEDPA asks of us mandates that we affirm the district court's denial of the writ of habeas corpus.  Simply put, the question whether Maquiz's gang-related sentence enhancement is supported by sufficient evidence under *Jackson* lies well within the realm of fairminded disagreement.

1

A reasonable jurist could conclude that Deputy Brewer's expert testimony adequately supported both elements of the gang enhancement—specifically, that Maquiz committed the 2001 robbery (1) "for the benefit of" PMV and (2) "with the specific intent to promote, further, or assist in any criminal conduct by [PMV]."  *People v. Albillar*, 244 P.3d 1062, 1070, 1074 (Cal. 2010).

Deputy Brewer's testimony supports the inference that Maquiz committed the 2001 robbery for the benefit of PMV; Brewer stated that the robbery "furthered knowledge of, fear and intimidation . . . for the gang and for [Maquiz] as a member of that gang."   Brewer's testimony likewise supports the inference that Maquiz committed the 2001 robbery with the intent to further the criminal activities of the PMV gang.  As he explained, PMV members like Maquiz "continue to work as an organization" whether they commit crimes alone or as a group, so the jury could have inferred that Maquiz committed the robbery with PMV's criminal objectives (rather than his own) in mind.

The foundation for Deputy Brewer's testimony might have been stronger, but his conclusion was far from baseless. As Deputy Brewer testified, Maquiz was an "active" member of PMV, meaning that he "actively r[a]n with the

gang" and that he was "living the [gang] lifestyle." The type of crime at issue—robbery—is also probative, because Deputy Brewer testified that one of the PMV gang's "primary activities" was engaging in robberies. Deputy Brewer's testimony must also be considered in light of his extensive experience, not just with gangs in general, but with PMV and Maquiz in particular. Deputy Brewer testified that he had personally made contact with roughly 150 to 200 different PMV members in Perris, and had met with Maquiz, specifically, five or six times.

Moreover, the jury had before it evidence supporting a conclusion that the 2001 robbery took place in or near PMV territory. For example, Deputy Brewer identified various buildings in Perris where the PMV gang had marked its territory using graffiti, and such buildings are near the location of Maquiz's 2001 robbery. Because the prosecution presented evidence of the location of the PMV graffiti and the 2001 robbery, a reasonable jury could have utilized the proximity between the two locations to conclude that both incidents took place in or near PMV territory. *See Jackson*, 443 U.S. at 326 (holding that court must presume trier of fact resolved all inferences in favor of the prosecution "even if it does not affirmatively appear in the record"). With the robbery so located, Deputy Brewer's conclusion finds further support in his earlier discussion that criminal street gangs seek to control their territory by spreading "intimidation and fear within the community."

The California courts thus could well have reached the fairminded conclusion that sufficient evidence supported the gang enhancement.

2

The majority casts aside Deputy Brewer's conclusion that Maquiz worked to benefit PMV by intimidating the community, because Maquiz did not flaunt his PMV affiliation when he committed the 2001 robbery. Maj. Op. at 16.

So what?

Deputy Brewer discussed the extensive efforts of PMV generally to make its presence known within the Perris community by, for example, marking buildings with territorial graffiti. In light of such efforts, the 2001 robbery easily could have been attributed to PMV even without Maquiz explicitly having announced "I'm a member of PMV!" when he committed the crime. And even if the majority thinks not, the Supreme Court has routinely rejected under AEDPA the sort of "fine-grained factual parsing" the majority must engage in to disagree. *See Coleman*, 566 U.S. at 655.

The majority also asserts that it cannot hold Deputy Brewer's testimony sufficient to support the gang enhancement because "[t]o hold otherwise would turn the statute into a penalty enhancement simply for committing a crime while being a gang member." Maj. Op. at 18. In so concluding, the majority makes much of the Supreme Court of California's statement that "[n]ot every crime committed by gang members is related to a gang." *Albillar*, 244 P.3d at 60. But *Albillar*'s statement reflects only a *state* gloss on the sort of evidence needed to support the gang enhancement. Even if the majority is correct that, under California law, proof of gang membership alone is typically insufficient, by itself, to support the enhancement, it is immaterial to the federal sufficiency question presented by Maquiz's *Jackson*

claim.  *See Coleman*, 566 U.S. at 655.  In reasoning otherwise, the majority, in essence, holds that Maquiz is entitled to federal habeas relief because the California courts misapplied California law.  This is not the province of AEDPA.

### III

At bottom, the majority seems simply to conclude Deputy Brewer's expert testimony is unpersuasive.  But that is not the majority's call to make under *Jackson*, and it *surely* is not the appropriate inquiry under AEDPA.  Taking AEDPA's command seriously, we must ask only whether a fairminded jurist could conclude that any rational jury might have credited Deputy Brewer's expert testimony.  The answer to that question is undoubtedly yes.

I respectfully dissent.